Good afternoon, Illinois appellate court. 1st district court is now in session. The 6th division, the honorable justice Sanjay T. Taylor presiding case number 22-1202 people versus Tawan Murray. Good afternoon. My name is Sanjay Taylor. I'm the. Residing justice of the 6th division of the 1st district appellate court. I'm joined by my colleagues on the panel this afternoon. Justice Michael Hyman and justice Carl Walker. The appellant will have 20 minutes and. Of that you may reserve whatever amount of time you want for rebuttal and then the legal have 20 minutes. If I can ask the parties to introduce themselves and for the appellant, just let us know how long you want to reserve for. Rebuttal good afternoon. Excuse me. Good afternoon. Your honors. I'm Hannah Peter. So, from the office of the state appellate defender. Be half of Tawan Murray, and I would like to reserve 3 minutes and rebuttal. And that's pronounced Peter. So, yes, your honor. Thank you. And this. Good afternoon. I'm assistant state's attorney, Margaret Hillman and I represent the people of the state of Illinois. Okay, good afternoon. Miss Peter. So you, you've raised a number of issues. So I assume that you determine which ones you wanted to focus on. And so we'll, we'll hear from you 1st. Yes, your honor. Thank you. And may it please the court. Although there are 5 issues presented in the briefing, I plan to focus today on issue 1 concerning improper extension of the speedy trial term. As well, as issue 2, in which the state has conceded that a rule for 31 B error occurred and thus the only question for this court is whether the evidence is closely balanced. I am, of course, happy to answer questions about any of the issues as we proceed. The key question for the speedy trial issue in this case is what the state must do to demonstrate due diligence when seeking an extension of this trial term after it has already located the key witness that it needs with time remaining in the term. Am I correct that there was 8 days they located and there was an 8 day window there? Your honor, the state proposes that it is an 8 days. We believe it is 10 days. Ultimately, it's 8 or 10. Okay. I mean, from my question, that won't make an effect because my question is. What were they supposed to do in 8 to 10 days and weekends are difficult to do anything in the administrative of justice, getting hold of people and so forth. What should they have done in those those days? Certainly, your honor, so there are 2 key points in time that the state failed in its burden to demonstrate due diligence. And I do want to emphasize that it is the state's burden. Under the statute, and that the statute must be liberally construed in favor of the defendant, but those 2 points were 1st. March 18th, that was a Monday. It was a scheduled trial date on which the defendant had already previously demanded trial and again, demanded trial on that day. On that day, the state had learned of Mr. Charles's whereabouts in Wisconsin in custody. They even served him with the subpoena that day. At that point, all that was needed to occur was this statutory process that both the parties discussed in our briefing under which a material witness certificate is filed with Illinois court and then a hearing is held before Wisconsin judge to allow for the extradition. Between Monday, the 18th and Friday, the 22nd, the state did nothing to procure that material witness certificate or otherwise begin the extradition process. I recognize that's only a few days and the state points out that Friday was the next regularly scheduled court date. However, it's my understanding that there are ways that the state could have brought this into court sooner had they really wanted to prioritize this issue. They could have filed a motion to advance the case. They could have motioned up their material witness certificate for a sooner date. But between Monday and Friday, emergency motion, the deck qualify. I believe that would be an option, your honor. Again, and we also know that there are things that happen off call. I mean, certainly the state was able to issue a subpoena for Mr. Charles on that Monday. So I'm not, you know, it's my belief that they could have likely gotten this certificate sooner had they wish to prioritize that. But at the very least, if that couldn't happen, the state still had the burden to explain why. The 2nd, Peter, so if I can ask you to move on to your 431 argument and your plain error. Argument, I think we're just hearing about. Yes, your honor. Certainly. So, if this court chooses not to reverse on speedy trial grounds, it should reverse and remand for a new trial on the basis of the rule for 31 be error that occurred. As I said before, the state has conceded that this error occurred and therefore the only question for this court is whether the evidence at trial was closely balanced. The state posits that a case can only be closely balanced if there is credible testimony on both sides that the jury has to weigh, but that position is clearly refuted by case law. And this court's own decision in people versus offman, which cites to the Illinois Supreme Court's decision and people versus makes clear that a case can be. And in fact, is closely balanced when even the state's own evidence is conflicting, unreliable or otherwise. You know, weak, and this is certainly a case where that is is true. Let me ask you this. You don't really acknowledge in your briefs, the. The video surveillance evidence, the very short. Gap in time between between Charles's conversation with Mr. Murray and the shooting. The phone records, the details provided by the eyewitnesses. Such as the defendant or the assailant had cheek level dreads, dark clothing. Dark hoodie, a hoodie, which I will note is very distinctive. You know, not only is it distinctive in the way it looks, but it is distinctive in the sense that it makes. The assailant stand out because we know it's a hot summer night and he's wearing a hoodie. So so why is why. Uh, why do you say that this is. A close case, you know, where you have all this evidence and and you have the surveillance evidence. Showing him in this distinctive hoodie. Talking to Charles, you have the surveillance evidence of a person in the same distinctive hoodie walking down the gangway. Towards the street, and if you look at the video. Of him approaching the victim. He's wearing that same distinctive hoodie. So why this? Why is this a close case? Your honor, the surveillance video in this case really has no value without Cameron Charles's testimony. Because it is only Cameron Charles that identified him very. Tepidly, I should say on the video without without Cameron Charles's identification, the video itself doesn't. Did identify Mr. Mr. Charles did identify the defendant. As a person who he was talking to before. The incident, right? He did indeed. Your honor. However, his trial testimony. Was that the the video clip showing the person walking down the gangway towards the shooting was not his brother. He did give a prior inconsistent identification to detectives, but that in and of itself shows that Mr. Charles's testimony is conflicting and unreliable. And that was the clip that you're on a reference that shows this allegedly distinctive hoodie. Mr. Charles at trial again, deny that that was his brother. The video that actually shows the shooting itself just shows the shooters back. It does not show anything particularly distinctive about the hoodie. And I recognize that if you look closely at the video, you do see. The same distinctive coloring, you don't see the actual colors because it's dark, but you see 1 side is dark and 1 side isn't, which is the same. Distinction you see in the other videos where it's clear. I agree that that that distinction is shown in some of the videos. Your honor. Black gloves worn by by the same person in a different clips. I believe there is perhaps 1 moment in the clip standing outside where gloves are visible. But again, I would just say that these videos themselves do not have independent. Significance without Mr. Charles's testimony and Mr. Charles again provided inconsistent testimony at trial from what he told detectives at an earlier point in time. He was heavily intoxicated at the time of the incident and heavily intoxicated at the time of his initial arrest and interview by the police. He, you know, he had. Quite a bit of issues with his testimony, not just not the least was that he really didn't even give a lot of details on his own without the prosecutor leading him into certain details. I would also point out, you know, this is a case where there is no forensic evidence. There's no fingerprints. There's no gun. There's no gunshot residue. Mr. Murray gave no inculpatory statements. The 2 I would also, it appears that here. The other 2 alleged witnesses never really identified him. So, the only person that identified him at trial was his brother. Is that his biological brother? By the way? Yes, your honor it is and that's correct. That's correct. He was the only sorry. And so, no, my question to you, though, is that. And there was no, he didn't Mr. Murray didn't testify. So we don't have that. All we have is Charles and you're arguing that Charles's testimony was not credible because of the inconsistency. Is that correct? I'm arguing that Mr. Charles had significant credibility issues. Ultimately. I agree that credibility is an issue that the jury needed to resolve. But the jury in this case had to decide between Mr. Charles's trial testimony and the statements that he previously gave to detectives. They had to determine if Mr. Charles's testimony was credible as a whole and that is what makes this case very similar to the often case in that case. Again, there was. States witnesses providing conflicting evidence. The defense did not present testimony or other evidence, but this court concluded that where there was. Conflicting or otherwise unreliable evidence on the state side that is enough to provide a close case. Certainly, I know you didn't and I know you didn't intend to argue this. At least you didn't tell us you would argue this. But how does all of that impact all of the leading questions that the prosecutor asked? Because it seems to me that in this case. The prosecutor literally walked and we call it a Mr. Charles, and I guess we can continue to do that. We realize that Charles was his 1st thing. But the prosecutors literally walked him through the testimony. There he didn't even need to testify. He was asked. Leading questions the entire time. Do you want to respond to that? Because that would have had an impact on the jury. I agree, your honor, and because of that, there were certain details that were provided to the jury that may not have even come out. Had Mr. Charles been allowed to testify without the leading questions. For example, I think 1 of the most glaring examples of this is the state asked Mr. Charles. When you were with Mr. Murray that day, did you see that he had a gun with him? And Mr. Charles, of course, responded yes. Now, if he had not been led into that, is it possible that he would have testified differently? That there was not a gun. The prosecutor even then went on to ask Mr. Charles if the gun was a 9mm. Mr. Charles said he didn't know. That still provided that sort of inkling in the jury's mind that perhaps this was a 9mm gun, which would catch the murder weapon. His counsel, Mr. Murray's counsel was silent. That's correct, your honor. And we do acknowledge in our briefs that a number of these leading questions and improper prior statements were not fully preserved. However, this is where we get into the issue of the closely balanced evidence. So, you know, while I was arguing that in the context of the Rule 431B error, it also applies in this context as well. But really, I think the two issues that Mr. Cameron Charles said that the person walking down the gangway was not his brother. That is his trial testimony, your honor. I thought his trial testimony was that he didn't know whether it was his brother or not. So there were two questions asked of him, and I'm happy to pull over the transcript. But he was first asked if that was his brother, and he responded, can't tell. And then he was asked again, is that your brother? And he said, no. So and on rebuttal, I'll be happy to provide the page citation for that. But that was his trial testimony. There was, of course, a prior inconsistent identification that he made to detectives, and we do acknowledge that. But once again, that- Mr. Charles also identified the car that pulled into the alley behind the apartment as the one that looks like the same car that his brother, Mr. Murray, was in. Is that correct? You acknowledge that? I acknowledge that he testified it looked like it. I will say on cross-examination, he testified that he was not sure. He did also give conflicting testimony about the color of the car. At certain points in his testimony, he said the car was silver. At other points, he said it was red. He acknowledged that he told detectives that it was red. So again, that's just- He decided to talk- well, he was confronted with the videotaped evidence, and that's when he acknowledged the car was silver, right? That's true. I do believe that there was also a point in his trial testimony where he referred to the car as red, and I will provide that on rebuttal as well. But again, these are all instances of Mr. Charles providing inconsistent details, conflicting testimony between what was provided at trial and what was earlier provided to the detectives. And this is really the state's only connection between Mr. Murray and the crime is Mr. Charles' identification. The whole case is centered on Mr. Charles' testimony. I mean, there is nothing else. Agreed, Your Honor. The difference with the six years it was offered him before trial, they didn't have Mr. Charles, and then what happened later on. I know we haven't talked about that issue, but I'm just saying that there was nothing that the state had. Agreed, Your Honor. This was the state's key witness. And like I said before, the surveillance video really had no value without Mr. Charles' prior identifications on the video. And Ms. Peterson, you did argue the leading questions in your brief. I know I started by saying you said you were going to argue it today, but you did argue it in your brief. But you also didn't say you were going to argue the ineffective assistance of counsel, but you did argue that in your brief as well. Do you want to respond to some of those arguments again? Yes, Your Honor. Mostly, I would just stand on what's in the briefs. I believe that it's mostly fully fleshed out there. But counsel clearly did recognize that there was a problem with leading questions and prior statements here. And then post-trial counsel recognized this as well in trying to pull all of this into the post-trial motion. But quite frankly, there was simply too much, and it would have likely been disrupted to the trial had trial counsel attempted to object to every single instance. Peterson, a lot of the testimony that you've raised, you've argued is error. Isn't much of that cumulative of evidence that came in otherwise on those issues? I don't believe it is, Your Honor. That is the state's position. But again, the state has argued that it's cumulative of the video. But the video gets us nowhere without Mr. Charles' testimony. Some examples of details that came in that would not be cumulative of other details are, first, like I referred to earlier, the fact that Mr. Murray had a gun earlier in the day and then again that night. That came in in no other way. Let me ask you this. Was there any objection to the testimony that Mr. Murray was depicted in the video talking to Charles in front of Charles' apartment before the incident? Not that I'm aware of, Your Honor. And that video shows him in a distinctive hoodie, correct? I would agree that at certain points it appears to be two different colors. Mr. Charles, when he testified, though, said that he believed it was just black, even after looking at the video. And then it also shows him putting gloves on? I believe that is shown in the video, Your Honor. I'm not sure where I am on time. If you can wrap up in the next two minutes. Certainly, Your Honor, thank you. So, frankly, I think we've covered everything that I planned to cover today. What about the photographs? The photographs were so disturbing that when the jury was taken out, those in the courtroom were warned. How should we handle that, in your opinion? Your Honor, I agree. The photos were highly disturbing. There was a number of photos that showed things that really had no bearing on any of the disputed issues, such as a bar going through the decedent's head, the large surgical incision. There was a photo of his heart removed from his body, which I really don't see any relevance for. Did that go to his intent to kill? Your Honor, it certainly could have some minimal relevance towards that. I acknowledge that. But I think the prejudicial value vastly outweighs any probative nature here, especially because the state of mind of the shooter in this case was not in dispute. Certainly, the state had— There were 11 photos, I believe, of a scar from a surgery that he had prior to this incident that was all shown to the jury? It was actually not a scar, Your Honor. It was an incision made during the autopsy. So it actually showed Mr. Burton's insides, essentially. It was pretty graphic. It was sewn up, wasn't it? No, Your Honor. It was open. Okay. These are graphic photos. Certainly, we acknowledge there is not a lot of supportive case law, especially in recent years on this issue. But we would contend that this is a particularly unique case, especially where the state then went on to use these very graphic photos in their closing in a way that really wasn't particularly necessary and likely would have just inflamed the juries. I mean, that's the issue. And with regard, if we take that issue, what is your recommendation and how we would define where the judges should decide whether they should be using it? I mean, particularly in this case, the manner of death was not at issue. Correct, Your Honor. I think the issue would be best decided on the grounds that the prejudicial value outweighs any minimal prohibitive value that there is. That's a standard, yes. Using the typical standard, the judge abused the discretion, her discretion? Yes, Your Honor. That would be our position. Any more questions, Ms. Peterson? Okay, thank you. Ms. Hillman. Good afternoon again. May it please the court. Again, I'm Assistant State's Attorney Margaret Hillman. I represent the people of the state of Illinois. And with the court's permission, I would like to begin responding to counsel's speedy trial arguments. If I can ask right on to the 431 and leading questions and prior statements issued. Yes, absolutely. The people do acknowledge that the court should not strictly comply with Rule 431B when they fail to ask if the denier understood and accepted the zero principles, but that does not automatically render the trial unfair. And here, the defendant cannot show he suffered prejudice under the first prong of the plein air doctrine. The evidence here was not closely balanced. The court should look at this using a common sense assessment of the totality of the evidence. And here, the evidence just was not closely balanced. As has already been mentioned, the defendant was identified on surveillance video by his own brother. This wasn't a situation where the defendant was identified by a stranger who had mere seconds to observe. This was his brother who also spent the entire day with him. But who also gave conflicting testimony though, correct? From his trial testimony. So I will say that Cameron Charles was a reluctant witness for the state, but a reluctant witness is different than an unreliable witness. There were times in his testimony where he, it was very obvious that he did not want to identify his brother, but at the end of the day, his identification in that surveillance video came in as substantive testimony. He was not in any way led into that identification of his brother. And that identification with the surveillance video, showing someone wearing the same gloves, that same hoodie, and then shooting and killing the victim in this case is all corroborative of what he said. And that makes him a reliable witness. Any biases also that he may have had were clearly in favor of the defendant. From the inception of this case, we knew that Cameron Charles was someone who was going to be reluctant to incriminate his brother. From when he was in police custody, he said himself on the stand that he did not want to tell police what happened until he was confronted with the surveillance video that showed him and his brother outside of his apartment. And then again- We don't know whether the jury ever accepted and understood the Zaire principles, the 431B principles, because the trial court judge didn't cover it properly. So with that, and that's an issue here is whether or not the evidence is closely balanced. So let's kind of discuss a little bit of why do you believe this evidence is not closely balanced? So the evidence is not closely balanced because the defendant was identified again by his own brother on surveillance video. His brother's testimony was corroborated by the surveillance video. It was corroborated by the testimony of Brittany Thomas and Abdullah Lowry. They actually testified several times that they couldn't identify him. That's absolutely true, your honor. They used to speak on occasions, maybe three, but they said they couldn't identify him. They absolutely said they could not identify him. That's true. They were also running for their lives. But what they did testify to, Brittany Thomas testified that she saw the shooter had cheek length dreads. And the evidence showed that the defendant at that time had cheek length dreads. Additionally, Abdullah Lowry testified that the shooter was wearing a black hoodie, black pants, and had a black gun. Again, corroborative of what the defendant was wearing on the surveillance video when Cameron Charles identified him. Additionally, the other corroborating information is there is only one individual out there that night that is wearing a hoodie and gloves. This was an August night. All of the testimony was consistent. It was hot outside. And the defendant is wearing a hooded sweatshirt and gloves, which is starkly different to everyone else on that surveillance video. Not only just wearing the hoodie, but with the gloves on. With the hood up to obscure his face. And the conversation between the defendant and Cameron Charles discussing the surveillance video shows exactly why the defendant was dressed the way he was, and that was to conceal his identity. And so all of those things corroborate what Cameron Charles says. But what he says was all based on leading questions. So the prosecutor led throughout, no objection from the defense attorney, and just basically walked him through the evidence as if he were a hostile witness. So if I may, I will start by addressing, there was one leading question that was actually, one leading objection that was actually preserved. And that was, that question was, the objection was sustained to that question, and there was no answer. So there was no issue there. As far as the remainder of the leading questions, much of that testimony was cumulative of the other testimony that was admitted into evidence prior to Cameron Charles actually testifying. Things about the car that he was driving in, the black gun, the phone calls, whether Cameron Charles called the defendant or the defendant called him, what times those happened, that was corroborated by the T-Mobile records that were also admitted into evidence independently. It appears that what the defendant's issue with is not the evidence itself, but it's how the evidence was elicited. And here, it is the defendant's burden to show error and prejudice, and he simply cannot do that because this evidence was admissible. And how this evidence came in just simply does not prejudice the defendant. So you don't believe that he was in no way prejudiced by all those leading questions? Because it really boils down to, and then I know you mentioned that some of those were preserved. Well, actually, none of those were preserved pretty much other than the one that you mentioned. So now it's almost like just a circular thing. So now we come around to, well, it's ineffective assistance of counsel. It's like there's problems every door you turn to, you solve it, but then it leads to the next problem. So it's like, how do we get around this circular issue that we have with this case? Well, I should say that I have, I won't speak for anyone else. What it comes down to, Your Honor, is that it is the defendant's burden to show he was affirmatively prejudiced, and he absolutely was not in this case. Other evidence that- Well, you say he wasn't, you said they have the burden and he wasn't in this case, but they have shown that you just don't accept what they've said. But so it's different than not showing it. I mean, they have made arguments. Yes, they have made arguments. Right, but under your idea that, I mean, all these leading questions in counsel just sitting there, there's a reason why you can't ask leading questions. And particularly in a case like this, as Justice Walker was saying, then we're led to the idea that counsel didn't do an effective job because that's why that shouldn't happen. If it was had to do a different way, we may not be sitting here today if there had been objections. Well, again, the errors in themselves did not prejudice the defendant. And because- Well, there's so many of them, there's all these errors. There's errors, you know, again, going back to the analogy, there's errors all over the place. And you say, well, any one of them, all of them together, none of them, none of them mean anything. Is that your position that even though there are errors, nothing matters because there's a video and we had some little testimony from the two witnesses who couldn't identify him and from the brother. We just have, we got a little bit, but we got some stuff there. And you're saying, well, that's not even close. It's not even a close case. Your Honor, so yes, what I'm saying is this is not a case where regardless of however many small errors there may have been that- Well, are these small errors? I mean, that's, I don't know if they're so small. That's what you're saying, but let's assume they're errors, whether they're large or small is a different issue. This is not a case where the defendant can show prejudice specifically because the errors and how the information was elicited, the information would still be admissible. And at most it was collateral. Things like the defendant takes issue with whether the defendant had a gun in the car when he was driving around with Cameron Charles or whether he had a gun in the apartment. It doesn't matter if he had a gun in the car or a gun in the apartment. Cameron Charles testified that he had a gun that he put in his waistband immediately prior to getting in the car moments before the shooting took place. That's when the gun mattered. And that was not asked with a leading question. What about the telephone calls between the brothers? The telephone calls? Yeah. How important is the phone calls? Well, I think the phone calls are important because it shows the defendant's state of mind. And it also shows the communication between Cameron Charles and the defendant and what Cameron Charles also believed was happening there. He was with this defendant moments before something happened. And if you read in a dual allow race testimony, he mentioned that Cameron Charles had been acting strangely. He was not as talkative as he had been on a prior occasion. And he seemed to be looking up and down at the victim. Those phone calls were important because they go to show the defendant's state of mind. They go to show motive and they also show opportunity because as was stated by Cameron Charles, the defendant had a problem with this victim. And those phone calls, well, the eliciting of those phone calls through Cameron Charles was a bit difficult at time, again, because he was a reluctant witness. Those phone calls came in through the T-Mobile as a stipulation. And if I may, then I will go on to talk a bit more about the closely balancedness of this evidence. Again, I'd like to distinguish this case from Offman. Specifically in Offman, the court found that the evidence came from unreliable witnesses. They offered conflicting accounts. Specifically, there were, they said that the testimony rested on impeaching and conflicting evidence of a jailhouse informant, a man who tried to separate the defendant from his girlfriend, so someone who had motive in that case and a crack addict who wasn't forthcoming with the police. Now that is so starkly different from the case we have here because the case we have here, the main witness who identified the defendant is his own brother who testified that he loved his brother back on August 4th of 2016. And he loved his brother the day he was testifying as well. This was an individual who said this whole situation was heartbreaking to him and it left him heartbroken, which explains his reluctance to identify and help prosecute and put his brother in prison for the murder of his friend. And these are all things that the jury could take into consideration and weigh when they were reviewing Cameron Charles' testimony. And counsel did touch briefly on Cameron Charles' intoxication. That really isn't an important factor in this case as far as either the statement or the identification goes. We know that Cameron Charles was telling the truth regarding the events of that night because it corresponded and was corroborated by the video, which does not lie, and the other two eyewitness testimonies. Also, he was not under the influence at all when he began to tell the detectives and during his final statement to the assistant state's attorney because he had been in police custody starting on, I believe, August 4th all the way through August 6th when he had finally made that videotape statement. So he was not under the influence during that videotape statement or during any of those statements to detectives. And one final thing, I know that there were questions about Cameron Charles saying that it was not his brother on the video clip. On page 500 of the report of proceedings, Cameron Charles was shown video clip number three at 58 minutes and 36 seconds, and the prosecutor asked, do you see a person in what's now a still of this clip? He said, yeah, the question. And is that your brother? Answer, can't tell. Question, is the person in this clip wearing the same sweatshirt as your brother was when you were standing there talking in front of the building? Answer, from what I remember, the hoodie was all black. It looked like, I don't know what this patch is right here. Question, okay, at 58.39, it's a little bit more of a closeup picture of the person in the video. Do you recognize that as being your brother? No. So the state would contend that this is not Cameron Charles saying, no, that's not my brother. This is Cameron Charles saying, no, I don't recognize that as my brother. So it's different, and it's a small difference, but the difference here is he is denying saying, I recognize that as my brother. He undoubtedly recognized his brother in the first still because he couldn't deny it. He couldn't refute it. He was already locked into that, and it was the person he was talking to when there were only two people in the still frame. At a time when he sees an opportunity to try to help protect his brother, which goes back to those biases for the defendant, he stood on that, and he attempted to backtrack, but he did not say, no, that is not my brother. And Ms. Hillman, you just mentioned that he had been drinking all day that day. Is that correct? Is that what you just reminded us of? Yeah, that Cameron Charles has said he had been drinking. Well, also, isn't it clear that Charles had been smoking marijuana all day and using ecstasy all day? He does testify that he had been doing that on, I believe, the third and leading into the fourth, yes. However, as I was saying, this is not the type of case where his ability to perceive is in question here. It's his own brother who he was talking to moments before the shooting happened. He's watching himself on video with his brother who he readily recognized. He readily recognized himself. And at the time that he gave those statements, those statements that are corroborated, again, by the video and by the other eyewitnesses, there was no way for him to have possibly been under the influence because he had been in custody at that point for such a long period of time. I'd like to go to the sentencing. How do you justify the lack of consideration for Murray's rehabilitation given the 80-year sentence? So, in this case, the defendant's 80-year sentence fell within the statutory sentencing- I understand that, but that wasn't my question. His lack of consideration for it. That's the fact that the judge did not consider that in a sense. The sentencing court said he considered the defendant's rehabilitative potential as well as the necessity to deter others from committing this type of offense. And I'll note that at the time that the sentencing court sentenced the defendant, he had just heard that the defendant was convicted of three prior violent Class X armed robberies, and he received eight years concurrent on all of those. That was back in 2012. So, it was nearly four years later that the defendant committed this heinous and vicious crime. And it was certainly not an abuse of discretion for the trial judge to sentence the defendant to 80 years, which was within the statutory sentencing range. Can I ask you a question about the photographs? I looked at them and maybe I just don't recall, but counsel indicated that there was a photo shown to the jury that depicted the victim's insides. My recollection was that he was sewn up, but maybe I don't recall that correctly. Well, I am not a medical professional, but I did note that some of the incisions on the victim's body, I believe, were sewn up, but there is a larger incision that the medical examiner testified was made in life-saving measures and told the jury that it had nothing to do with the victim's death and was not caused by the gunshot wounds. That, I believe, was a little bit more open. However, the trial court exercised proper discretion in allowing those photographs. And you can tell that the trial court took painstaking measures in reviewing each one of those photographs and in reviewing its admissibility. Each of those photographs illustrated the 19 gunshot wounds that was sustained by the victim. And while the defendant now tells us that cause of death was not at issue at the time, that doesn't mean the people don't have to prove it beyond a reasonable doubt. It still remains an element for the people to prove. Addressing specifically the photograph of the heart, this was a photograph that it was of the heart on like a surgical table. The heart was cleaned up. It was not covered in blood. It was not overly graphic, overly gory. It showed two gunshot wounds and their trajectory, which is why the medical examiner did discuss it. And it showed the damages to the victim's organs. And so it was already admissible. It was already published prior to it being put in any type of slideshow. And so- There was no question that the victim died, right? And whether the number of shots isn't all that critical. Why all these graphic photographs necessary and that even they were so graphic that the judge had to warn the people in the courtroom about them. It just seems that in a case like this, the question, as we discussed before, Charles is the key witness. Is this the right guy? That's the question. How the man died, we know how he died. He got shot 19 times. And looking at these photographs, it isn't gonna change that. Your Honor, as far as what the actual question is today, in hindsight, is the identification. However, during the trial, the state have to prove each and every element of the offense. And one of those elements is that the victim died. Other elements include the defendants- We have an examiner, yes, but you don't. Yes, you can do that, but you don't need to show the pictures. You don't need the pictures to show that he died. When you have a man who comes from the autopsy and discusses the autopsy, usually autopsies, in fact, all the time, are done on people who have died. So we know that he was- How did he die? Well, there were 19 shots. But that's different testimony than showing the pictures. Pictures can be very disturbing. And particularly for lay people, judges and police and others have become accustomed to them if they do that kind of work, but not for the lay people. And they're forced to look at this stuff when, again, you had enough testimony. You talk about duplication of testimony. Well, wasn't that a duplication of testimony? I understand your point, Your Honor. However, there have been cases where this has been allowed, where the manner of death is not called into question. However, both the medical examiner's testimony as well as the autopsy photos have been found to- that their value was more pro- was the probative value was not substantially outweighed by the danger of unfair prejudice and that their courts exercise proper discretion. And as far as the individuals in the courtroom who were warned, I would say that the individuals who are in the courtroom have to maintain a level of decorum while they're in court. And I think the warning is more so what you are about to see is your loved one, friend, or someone that you care about that is going to be on the screen. And if you cannot maintain decorum and not act out, because, again, that would be improper in front of a jury, then that is what the warning is for. The warning is more for prepare yourselves because you must maintain decorum. And there is no question- But that goes to the point that if they can't maintain decorum, you expect the jury to as well, right? But it's one of these, oh my gosh, moments. And that's what it is for those people. And that's what it is for anyone else who's not used to seeing those type of photos. And again, I mean, the trajectory of the bullets, all of that stuff, whether his heart was in or out of his body, that was not necessary. It had nothing to do with whether the manner of death. So there are other autopsy photos do have to do with the manner in death and do help corroborate the state's case. And at least in this specific case, the autopsy photo, while identification may be an issue now, at the time of trial, cause and manner of death could have also been called into question. The medical examiners, processes, who the person was that was shot, all of those things could have been called into question. The state simply doesn't know what the argument is going to be. And so the state can't be precluded from putting in the evidence to support their elements when the evidence is not, when the evidence does not, the probative value does not substantially outweighed by the danger of unfair prejudice. And so the judge did not abuse her discretion in this case. In fact, the judge took painstaking measures to ensure that each one of those photos did not prejudice the defendant. And I'm not sure if I have any time left. So yeah, you're out of time. Do you have anything else to wrap up in the next minute? Um, just briefly that we would ask that this court affirm the defendant's, both the defendant's conviction as well as his 80 year sentence. Thank you. Questions from the panel. Okay. I think your honor, just a few quick points. First, I did want to provide some citations to the record that we were discussing. First on report of proceedings, page 486, the Mr. Charles was asked, how did he leave? Referring to how did Mr. Murray leave from the apartment building? And he stated, and this was a trial, a red Impala pulled up. So he actually did give inconsistent details at trial about the color of the car. The second page that we were discussing is report of proceedings 500. My colleague actually read out the transcript from those inconsistent testimony about whether the video showed Mr. Murray. I don't feel like there's any need to rehash that. I think the transcript speaks for itself. With respect to the close nature of the evidence, Justice Walker, I think you said something along the lines of there were errors every door you turned. And I think that's exactly the issue with this case. And that is why, you know, issue three that we raised regarding the leading questions and prior inconsistent statements and issue four about the autopsy photos. This is all wrapped in together with the close nature of the evidence, particularly the questions asked of Mr. Charles, because a lot of information came in that may not have otherwise come in. And for the state to argue that all this information was still admissible is kind of speculative. You know, we don't know had the state followed the proper procedures for asking an open-ended question and then either impeaching or refreshing recollection or what have you. We don't know if that would have elicited the same information as what came out. And so I do just want to point out a few of the details that came in that were not cumulative of other evidence. We already discussed the fact that Mr. Murray had a gun the day of the shooting that would not have come in otherwise. And the fact that he allegedly then still had a gun when he left the building. Does it matter that he had a gun earlier in the day when there's video of an assailant with a gun of shooting at the time of the incident? Well, I think the state has argued that the fact that Mr. Murray had a gun earlier in the day and then when he was talking to Mr. Charles, corroborates his identification as the shooter. And so, you know, the state has argued that that's the significance of that fact. And so, you know, I would say that that would be why it matters. But also the fact that he was wearing gloves, that came in through a leading question. The fact that there was supposedly this conversation about whether Mr. Murray was told there were cameras all the building and whether Mr. Burton was on Mr. Murray's hit list or his list. These all came in through improper questioning and would not have necessarily come in otherwise. And I just want to point out overall, you know, the state is arguing and characterizing Mr. Charles as a reliable witness, acknowledging that Mr. Charles really is the linchpin of the case. But I fail to see how Mr. Charles can be a reliable witness when the state throughout the trial had to repeatedly impeach its own witness and use leading questions in order to get the details that it wanted. I'm happy to answer any further questions that this court has. Is it improper to impeach your own witness when your witness claims lack of knowledge? When previously the witness was able to answer the question? Your Honor, for purposes of impeachment, yes, it is improper. The witness actually has to give affirmatively damaging testimony and lack of recollection is not enough for impeachment. Isn't there a case law that says that lack of knowledge can be damaging? I believe the state cited one case about that. My recollection is that those cases that involve lack of recollection involve witnesses that profess that they could not remember anything. And that is not the situation that we had here. The People v. Brothers case explains why in situations where witnesses do need to be led or do need to be impeached, the appropriate process for doing so has to be followed with respect to every specific detail that the state wishes to elicit. That might be different for these sorts of cases where a witness just says, like, well, I can't remember anything. I have nothing to say. That's a different scenario than we have here. So you're drawing a distinction between those who profess complete lack of knowledge and those who may simply profess lack of knowledge and key points. Correct, Your Honor. For purposes of impeachment, certainly. For purposes of admitting a prior statement of substantive evidence, there is case law that says that lack of recall is enough for a substantive admission. But what needs to happen is the state has to ask the open-ended question of the witness first. And that is not what happened here. So with respect to the prior inconsistent statements that were admitted substantively, the state just jumped right into the prior inconsistent statements without ever asking Mr. Charles the open-ended questions that it was required to ask. So for example, when asking did you tell the detectives that there was a conversation about cameras being on the building, the state should have actually asked, do you recall having a conversation with Mr. Murray about whether there were cameras on the building or something along those lines, not getting into the prior inconsistent statement unless Mr. Murray professed a lack of memory on that detail. That's not what occurred here. Anything else? Anything else, Ms. Piertis? Just that we ask that for all the reasons discussed here and in the briefs, we ask that this court grant the relief requested. Thank you. Any more questions from my colleagues on the panel? Thank you, counsels, for your zealous advocacy this afternoon. The case is submitted and court will issue an opinion in due course. Thank you. Thank you.